Edward C. HESTER,
Plaintiff-Appellant,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, et al., Defendants-Appellees.

No. 85–7699.

United States Court of Appeals, Eleventh Circuit.

June 12, 1987.

**1538**

C.V. Stelzenmuller, Birmingham, Ala., for plaintiff-appellant.

James T. Langford, Atlanta, Ga., for International Union.

Donald R. Rhea, Rhea, Boyd & Rhea, Gadsden, Ala., for International Union-Local 320.

Thomas N. Crawford, Jr., Birmingham, Ala., for International Union-Local 660.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

## I.

The appellant in this case, Edward C. Hester, is a member of the International Union of Operating Engineers (IUOE) and its Local 320. He is a crane operator. Local 320 represents Hester and other heavy equipment operators engaged in construction work for employers in northern Alabama, including the Tennessee Valley Authority (TVA), a corporation wholly owned by the federal government.

Appointments to union jobs with TVA are restricted in two relevant ways. First, IUOE's collective bargaining agreement with TVA contains a provision giving preference in hiring decisions to veterans over non-veterans, and to disabled veterans over non-disabled veterans.[1] Second, IUOE's

---

1. The section of the agreement governing "Selection for Appointment and Promotion" contains the following:

Applicants who meet the qualification requirements of a position are considered as follows for appointment. Applicants with status of veteran with a compensable disability of 10 percent or more incurred in military service are appointed first in the order of their qualifications. The remaining applicants considered for appointment are divided into three groups: outstanding, well-qualified, and qualified. Applicants in the "outstanding" group are appointed first, then applicants in the "well-qualified" group, then in the "qualified" group. Within a qualifications group, applicants with veterans' preference are appointed before those without such pref-

constituion prohibits a member of one local from working within the jurisdiction of another local without the latter local's consent.[2]

Hester was employed by TVA at its Yellow Creek facility in Iuka, Mississippi, which is within Local 320's jurisdiction. In the summer of 1983, TVA began laying off workers, including Hester, who was replaced by a disabled veteran. Hester, a non-disabled veteran, then asked TVA to place his name on its veterans' preferential hiring list.

Soon thereafter, in August of 1983, TVA needed a crane operator at its Brown's Ferry site in Athens, Alabama, which is in the jurisdiction of another local, Local 660.[3] Local 660 referred a non-veteran to TVA from its hiring hall. TVA rejected that candidate and, pursuant to the collective bargaining agreement, looked to the veterans' preferential hiring list. TVA hired Hester.

On September 15, 1983, Local 660 initiated disciplinary proceedings against Hester for working within its jurisdiction without its consent. On November 8, 1983, Hester was found guilty in a Local 660 trial and was fined $3,000. Two days later, Hester appealed his fine to IUOE, which "waived" the fine pending the outcome of his appeal. On August 6, 1984, IUOE de-

nied Hester's appeal but reduced his fine from $3,000 to $500. Local 320 then wrote a letter on September 5, 1984 to Hester explaining that IUOE's constitution would not permit it to accept his membership dues until he paid the $500 fine.[4]

On November 7, 1984, Hester filed suit in the district court against IUOE, Local 320, and Local 660. He alleged three causes of action: (1) the fine that IUOE and Local 660 imposed, and Local 320's refusal to accept his dues, were disciplinary actions in violation of the safeguards against improper disciplinary action provided by the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(5) (1982);[5] (2) IUOE breached its duty of fair representation when it affirmed a fine against Hester for exercising his right, under IUOE's collective bargaining agreement with TVA, to receive preference as a veteran; (3) Local 660 violated that collective bargaining agreement when it did not honor the veterans' preference provision. Hester later amended his complaint to add a pendent state law claim based on Alabama contract law.

IUOE, Local 320, and Local 660 each filed motions for summary judgment, asserting that Hester's causes of action were barred by the six-month statute of limitations found in 29 U.S.C. § 160(b) (1982).[6]

---

erence. Among those with veterans' preference, applicants who have status as noncompensable disabled veterans' [sic] are appointed first. Membership in a union affiliated with the Council is a positive factor of merit and efficiency which is considered in determining relative qualifications for appointment.

2. The "Travel Service Dues" section of IUOE's constitution states that "[m]embers of one Local Union shall not seek employment, be employed, or remain at work at the craft within the territorial jurisdiction of another Local Union without consent of such other Local Union...."

3. Local 660 represents heavy equipment operators engaged in maintenance, as opposed to construction, work in northern Alabama.

4. The letter cited the constitution's "Payment of Fines" provision, which includes the following: "Members thirty (30) days in arrears in the payment of fines shall be denied voice and vote in their Local Union, and thereafter until the fine is paid no dues owed by such members can be received or accepted by the Local Union."

5. 29 U.S.C. § 411(a)(5) (1982) states, in full, the following:

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

6. This statute is taken from section 10 of the National Labor Relations Act, which sets forth the National Labor Relations Board's powers to prevent unfair labor practices, and provides as follows:

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a

The district court granted the motions for summary judgment, concluding that "Hester is barred from litigating his claims in federal court because this court lacks subject matter jurisdiction." As to Hester's first and third causes of action, the court reasoned that because Hester's employer, an entity of the federal government, "is not subject to the [LMRDA]," 29 U.S.C. § 402(e) (1982), the protections afforded by that Act do not apply to Hester's relationship with his union and its locals; in other words, for the LMRDA to apply to either the employer or the union, both the employer and the union must be subject to the Act. The court similarly dismissed Hester's duty of fair representation claim, concluding that because neither TVA nor IUOE is subject to LMRDA, it would not imply from the Act a duty of fair representation to TVA employees. The court also dismissed Hester's pendent state law claim, in light of its finding that it was without subject matter jurisdiction. As a final matter, the court declined to discuss the statute of limitations defense.

## II.

We begin our analysis of whether there is subject matter jurisdiction in this case by examining the Act's design. The Act is a piece of remedial legislation, a major purpose being "to protect union members against possible overreaching by union officials." *In re Gopman*, 531 F.2d 262, 266 (5th Cir.1976) (citation omitted).[7] Fostering union democracy is one way the Act protects union members. By establishing a "bill of rights," the Act guarantees "each union member protection against infringement of his rights to vote, to meet, and to participate in discussions on matters of concern to him and his union." *Navarro v. Gannon*, 385 F.2d 512, 518 (2d Cir.1967), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19

L.Ed.2d 1294 (1968). Essential to that protection are the due process safeguards the Act provides against improper disciplinary action. *See* 29 U.S.C. § 411(a)(5) (1982).[8]

■ This design reveals that the focus of the Act is on controversies between a worker and his union, not on the relationship between a union member and his employer. *See Burns v. United Bhd. of Carpenters, Local No. 626*, 204 F.Supp. 599, 601 (D.Del. 1962) ("It is abundantly clear that the ... Act only concerns controversies between a member and the Union to which he belongs."). We believe that the district court's analysis of its subject matter jurisdiction was faulty because it asked whether the employer in this case was subject to the Act, when the Act's bill of rights does not apply to employers. The operative question on which the district court should have focused is whether IUOE and its locals are labor organizations subject to the LMRDA. As we discuss below, that question cannot be resolved solely by determining whether the employer for whom the union member happens to be working satisfies the Act's definition of employer.

### A.

"Labor organization" is defined by the LMRDA, 29 U.S.C. § 402(i) (1982), as follows:

"Labor organization" means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of

member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided,* That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made....

29 U.S.C. § 160(b) (1982).

**7.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**8.** *See supra* note 5.

pay, hours, or other terms or conditions of employment. . . .

One of the components of this definition is that the organization of employees must exist for the purpose of dealing with employers [9]: "a labor organization is not covered unless it represents, or is chartered to represent, or is actively seeking to represent 'employees' of an 'employer' as these terms are defined in the act." Smith, *The Labor-Management Reporting and Disclosure Act of 1959*, 46 Va.L.Rev. 195, 199 (1960).[10] The LMRDA expressly excludes, as an "employer," the United States and its corporations, such as the TVA: " '[e]mployer' . . . does not include the United States or any corporation wholly owned by the Government of the United States. . . ." 29 U.S.C. § 402(e) (1982).[11]

 Although government-owned corporations are excluded from the definition of employer, we nevertheless read the definition of "labor organization" to include those associations of workers that deal with *any* "employer," as defined by the Act. In other words, labor unions that are "mixed"—unions representing employees working for private employers, as well as employees working for the federal government or government-owned corporations— are "labor organizations," and thus are subject to the LMRDA. *See National Educ. Assoc. v. Marshall*, 100 L.R.R.M. (BNA) 2565, 85 Lab.Cas. (CCH) ¶ 11,172 (D.D.C.1979) [Available on WESTLAW, DCT database] (association consisting mostly of public sector workers is "labor organization" under the LMRDA because it permitted private sector employees to join and represented those employees in negotiations with private employers). Labor unions that exclusively represent employees working for the federal government or government-owned corporations, on the other hand, are not "labor organizations," and thus are not subject to the LMRDA. *See Local 1498, Am. Fed'n of Gov't Employees v. American Fed'n of Gov't Employees*, 522 F.2d 486, 484–90 (3d Cir.1975) (union not subject to LMRDA, because union "limits its membership to, and represents only, federal government employees in their dealings with the federal government"); *New Jersey County & Mun. Council # 61, Am. Fed'n of State, County & Mun. Employees v. American Fed'n of State, County & Mun. Employees*, 478 F.2d 1156, 1159 (3d Cir.) ("Public employee unions are not covered by [LMRDA,] because . . . these unions are not 'labor organizations' under the Act."), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); Smith, *The Labor-Management Reporting and Disclosure Act of 1959*, 46 Va.L.Rev. 195, 200 (1960) ("[A] union exclusively representing or seeking to represent only employees of a . . . governmental employer, is not covered [by LMRDA]."). This interpretation of the statutory definitions is in complete accord with the regulations of the Department of Labor:

PART 451—LABOR ORGANIZATIONS AS DEFINED IN THE LABOR–MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959

\* \* \* \* \* \*

In defining "employer," section 3(e) expressly excludes the "United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof." . . . A labor organization composed entirely of employees of the governmental entities excluded by section 3(e) would not be a labor organization for the purposes of the Act. . . . However, in the case of a national or international labor

---

**9.** One way in which a labor organization shall be deemed to be engaged in an industry affecting commerce is if it is "recognized or acting as the representative of employees of an employer." 29 U.S.C. § 402(j)(2) (1982).

**10.** "Employee" is defined as "any individual employed by an employer." 29 U.S.C. § 402(f) (1982). An "employer" is defined as "any employer or any group or association of employers engaged in an industry affecting commerce" and which is an employer within the meaning of any federal employment law or which deals with any labor organization. 29 U.S.C. § 402(e) (1982).

**11.** The LMRDA also excludes state and local governments from the definition of "employer." 29 U.S.C. § 402(e) (1982).

organization composed both of government locals and non-government or mixed locals, the parent organization as well as its mixed and non-government locals would be "labor organizations" and subject to the Act. In such case, the locals which are composed entirely of government employees would not be subject to the Act, although elections in which they participate for national officers or delegates would be so subject.

29 C.F.R. § 451.3(a)(4) (1985) (footnote omitted).

Finally, we find it unlikely that Congress would create a statutory scheme making a labor union subject to the LMRDA only if the particular transaction in question involved a member who was working for a private employer. Congress acted in the public interest to protect workers whose

unions are susceptible to corrupt leadership—unions that deal with private employers, to whatever extent, and which are thus afforded power by federal labor law.[12] We know of no case that says a particular union is a "labor organization" under the LMRDA as to one member, working for the private sector, but not a "labor organization" under the LMRDA as to another member, working for the government.[13]

### B.

Counsel for IUOE candidly acknowledged, in his brief and at oral argument, that IUOE represents private sector employees and has contracts with private sector employers. Local 320 and Local 660 each admitted in their answer to Hester's complaint that they represent employees working in private industry. The union,

---

**12.** The federal statutes making up our nation's private sector labor policy—the Norris-LaGuardia Act, the Wagner Act, the Taft-Hartley Act, and the Landrum-Griffin Act (the LMRDA)—guarantee to employees working for private employers the right to form or join unions and the right to strike. *See* Labor Management Relations Act of 1947, 29 U.S.C. §§ 141–187 (1982).

Those statutes also require private employers to bargain collectively with representatives of their employees, namely, union leadership. Government employees, however, are excluded from the protection of those statutes. Beaird, *Labor Relations Policy for Public Employees: A Legal Perspective*, 4 Ga.L.Rev. 110, 115 (1969). The rights to bargain collectively and to use economic weapons to gain concessions from employers create power in the hands of leaders of unions representing private sector employees, power that does not rest in the hands of leaders of public sector unions. We have no reason to believe that when Congress passed the LMRDA to help ensure that union leaders would not abuse their power to the detriment of those they represent, it was any less concerned with regulating the internal affairs of "mixed" unions than with purely private sector unions. *See National Educ. Assoc. v. Marshall,* 100 L.R.R.M. (BNA) 2565, 85 Lab.Cas. (CCH) ¶ 11,172 (D.D.C. 1979) [Available on WESTLAW, DCT database] (LMRDA's purpose of protecting vital public interests applies to association whose activities with private sector consist of very small fraction of total activities). One reason Congress excluded purely government unions from coverage by the LMRDA was that those unions did not have the power associated with corrupt leadership. *See* S.Rep. No. 187, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.Code Cong. & Admin. News 2318, 2391–92 (LMRDA minority report of

Senators Goldwater and Dirksen discussing exclusion of federal government from definition of "employer"):

[Government unions] receive few or none of the benefits under existing labor law, both State and Federal. They are completely excluded from the coverage of the Taft-Hartley Act and thus are denied the rights and benefits extended to members of non-governmental unions....

....

Labor unions of governmental employees such as we have described meet every test of what constitutes a genuinely voluntary, private association. They have no power of any kind, statutory, economic, or otherwise, to compel anyone to join, or their members to remain such. They are completely dependent upon the voluntarily extended support of their members for their continued existence, and must in turn justify such support by the continued service they render their members. Any misconduct, dereliction, or corruption is well guarded against by the right of each member to withdraw from the organization.... As a result, corruption, racketeering, gangsterism, find it well nigh impossible to gain a foothold. As a matter of fact, we do not know of a single instance in in which these evils have been found to exist in a union of Government employees....

**13.** If a union is subject to the LMRDA, then all members, whether employed by the private or public sector, are protected by the Act's bill of rights. Neither the Act's definition of labor organization "member," 29 U.S.C. § 402(*o*) (1982), nor the bill of rights, 29 U.S.C. § 411 (1982), differentiates between public and private sector employees.

which also represents members who work for the TVA, is therefore "mixed." Its internal affairs are thus regulated by the LMRDA, even as to its relationship with a member like Hester, who at the time of his dispute with IUOE and the locals was working for a public entity. Accordingly, we find that the district court had subject matter jurisdiction over all of Hester's federal claims.

### III.

Because the district court dismissed the case for want of subject matter jurisdiction, it did not reach the question of whether the suit was barred by the applicable statute of limitations. We deem it appropriate to reach this issue of law and conclude that Hester's suit was not time-barred.

Two issues are presented in our examination of the statute of limitations question. First, the parties dispute whether state or federal law provides the substantive limitations period for Hester's claims. Second, we must decide when the applicable limitations period began to run.

### A

In *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court held that the six-month limitations period in section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), applies to "hybrid" section 301[14]/fair representation claims. The court found that section 10(b) provides a "closer analogy" to the federal cause of action than available state statutes, and that federal labor policies are better served by the six-month limitations rule.

In subsequent cases, we have considered whether the principles enunciated in *Del-*

Costello apply outside of the context of "hybrid" section 301/fair representation claims. In *Erkins v. United Steelworkers*, 723 F.2d 837 (11th Cir.), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984), we applied the section 10(b) six-month limitations rule where the employee claimed only that his union had breached its duty of fair representation. The plaintiff made no corresponding section 301 claim against the employer. Reasoning by analogy to *DelCostello*, the court concluded that:

> The application of § 10(b) is even more appropriate here than in *DelCostello*. In *DelCostello* the presence of the claim for breach of collective bargaining agreement, which alone would have been governed by a state statute of limitations for suit on a contract, counseled against adoption of the § 10(b) limitations period. The present action, involving only a fair representation claim, which the court in *DelCostello* held analogous to an unfair labor practice both in the right asserted and considerations involved, contains no purely contractual element militating against application of § 10(b)'s six-month period.

*Id.* at 839.

■ This court next considered the applicability of *DelCostello* to claims against a union under the LMRDA, 29 U.S.C. § 401, *et seq.*, in *Davis v. UAW*, 765 F.2d 1510 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986). The *Davis* court agreed with three other circuits[15] in holding that the *DelCostello* rationales require that the section 10(b) six-month limitations period apply to a suit against a union alleging violations of the LMRDA's bill of rights, 29 U.S.C. § 411. In addition, *Davis* applied the six-month limitations period retroactively.[16] We are

---

**14.** 29 U.S.C. § 185.

**15.** *Linder v. Berge,* 739 F.2d 686 (1st Cir.1984); *Local Union 1397 v. United Steelworkers of Am.,* 748 F.2d 180 (3d Cir.1984); *Vallone v. Local Union No. 705,* 755 F.2d 520 (7th Cir.1984).

**16.** The *Davis* court explained why it gave retroactive effect to its holding:

[W]e are bound by our precedent in *Rogers [v. Lockheed-Georgia Co.,* 720 F.2d 1247, 1250 (11th Cir.1983), *cert. denied,* 469 U.S. 916 (1984) ], which conclusively determined that the six-month limitations periods borrowed from 29 U.S.C. § 160(b) should be applied retroactively in order to further the federal labor policies inherent in the rule and to prevent the inequitable results of different

bound by *Davis* [17] and accordingly apply the six-month limitations period to Hester's action.

## B

Having determined that the section 10(b) six-month limitations period applies, we must determine when the six-month period began to run. Although *DelCostello* recognized the possibility that a union member's claims might be tolled during the time he or she continues to seek relief through grievance procedures, the court did not expressly address the issue.[18] In *Erkins,* the

---

state limitations period being applied to essentially similar federal causes of action. *Davis,* 765 F.2d at 1515 n. 14.

**17.** Hester argues that we should follow *Sewell v. Grand Lodge of Int'l Assoc. of Machinists,* 445 F.2d 545 (5th Cir.1971), *cert. denied,* 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972), which borrowed Alabama's one-year statute of limitations period in a suit brought to enforce the protections of 29 U.S.C. § 411 (1982). We cannot look favorably upon *Sewell,* because the analysis in *Davis* was compelled by the intervening Supreme Court decision in *DelCostello.* In any event, a panel of this circuit is not free to overrule a decision of another panel. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (prior decisions of Eleventh Circuit (panel or en banc) cannot be "overruled by a panel but only by the court sitting en banc"). Hester also argues that because *DelCostello* was a "hybrid" section 301/fair-representation suit brought by an employee against both his union and his employer, whereas Hester's suit is only against his union, *Davis* can be distinguished. The suit in *Davis* was similar to Hester's action: it was a cause of action filed solely against the union. The court in *Davis* was well aware of the factual distinctions between the suit before it and the "hybrid" one in *DelCostello. See Davis,* 765 F.2d at 1512–15. The *Davis* court nevertheless believed that the Supreme Court's policy concerns, as expressed in *DelCostello,* compelled it to apply the six-month limitation period to "an action based on a union's alleged mistreatment of its members by the denial of statutorily protected rights." *Davis,* 765 F.2d at 1514 (footnote omitted). Thus, *Davis* cannot reasonably be distinguished from Hester's cause of action.

**18.** We respectfully disagree with the dissent's suggestion that the Court's disposition of the two cases involved in the *DelCostello* appeal is contrary to our analysis. The dissent correctly points out that the union members' claims in case No. 81–2408, see *Flowers v. Local 2602, United Steel Workers,* 671 F.2d 87 (2d Cir.1982), were untimely because the plaintiffs conceded that their union's final action in processing their grievances occurred more than ten months prior to their filing suit. This holding is fully consistent with *Proudfoot* and our conclusion in the instant case. The dissent overlooks, however, the Court's disposition of petitioner DelCostello's claim in case No. 81–2386. *See DelCostello v. International Brotherhood of Teamsters,* 524 F.Supp. 721 (D.Md.1981), *aff'd mem.,*

679 F.2d 879 (4th Cir.1982). The Supreme Court noted that "[d]epending on when the joint committee's decision is thought to have been rendered, the suit was filed some seven or eight months afterwards." *DelCostello,* 462 U.S. at 172, 103 S.Ct. at 2294–95. Nevertheless, the Court remanded the case for consideration of whether "certain events operated to toll the running of the statute of limitations until about three months before he filed suit." 462 U.S. at 172, 103 S.Ct. at 2295. The "certain events" discussed by the Court consisted of the union's and the joint committee's decision on DelCostello's letter requesting "reconsideration" of the arbitration decision. *DelCostello,* 524 F.Supp. at 722–23.

The Supreme Court's remand of DelCostello's claims to consider "tolling" exposes the error in the dissent's reasoning. Under the dissent's view that a union member has a cause of action when "the union has considered his grievance and taken some action (or inaction) that would inform a reasonable person that the union has not or will not fulfill its duty fairly to prosecute the employee's grievance," *infra* at 1552, there was little doubt that DelCostello had a cause of action more than seven months prior to filing suit. As the district court concluded on remand from the Supreme Court:

The facts underlying the plaintiff's claims against Anchor and Local 557 were known to the plaintiff when he received notice of the denial of his grievance by the Joint Committee a few days after the July 19, 1977 hearing. At that time he knew his grievance had been denied and the facts indicating his union representative had been inadequate at the July 19, 1977 hearing. That the plaintiff was well aware of his representative's alleged inadequacies before the time of the December 1977 or January 1978 union meeting, the date he alleges his claim arose, is evident from the letter sent in September of 1977 to Union President Mr. O'Connor. In that letter, the plaintiff outlined all of the inadequacies of Mr. Morningstar's representation which he later alleged in his complaint.

*DelCostello v. International Brotherhood of Teamsters,* 588 F.Supp. 902, 908 (D.Md.1984), *aff'd,* 762 F.2d 1219 (4th Cir.1985). Despite the fact that DelCostello had a cause of action under the dissent's standard more than six months prior to filing suit, the Supreme Court remanded the case for the court to consider whether the statute of limitations began to run at some later point in time due to the plaintiff's efforts to

court decided that the employees' claims were barred, but no tolling issue was presented.[19] The Davis court discussed the difficulty presented in applying the statute of limitations where an employee pursues union grievance proceedings prior to bringing suit:

We do note a potential problem with applying the six-month limitations period to a suit alleging a violation of § 101 of the LMRDA, 29 U.S.C. § 411. A cause of action under section 411 accrues when the plaintiff union member discovers, or in the exercise of reasonable diligence should have discovered, the act constituting the alleged violations; at which time the statute of limitations begins to run. See Erkins.... However, section 411(a)(4) provides that a union member may be required to exhaust reasonable internal union procedures for up to four months before proceeding with a suit under section 412. Thus, union members might be forced into a "Catch–22" situation in which they could be barred from suing the union if they wait to sue for more than six months while exhausting union remedies, but could be dismissed from federal court for failure to exhaust internal remedies if they file suit within the limitations period without seeking to exhaust.

Two possible solutions come to mind. First, the limitations period might be tolled during the time a union member is exhausting his union remedies. Second, a court could require the filing of the lawsuit within six months, but stay the judicial proceedings pending completion of exhaustion of union remedies.

Davis, 765 F.2d at 1515 n. 13 (citations omitted) (emphasis added). The court concluded, however, that it need not resolve this question because the employee in Davis had filed suit approximately eleven months after he was expelled from the union without ever seeking to exhaust union remedies in the intervening time. Id.

The first decision from this circuit to apply the section 10(b) six-month limitations period to a case where a union member pursued union grievance proceedings prior to filing suit was Proudfoot v. Seafarer's International Union, 779 F.2d 1558 (11th Cir.1986), vacating in part, 767 F.2d 1538 (11th Cir.1985). On reconsideration, the Proudfoot court held, in the context of the "hybrid" section 301/fair representation suit, that the section 10(b) six-month limitations period begins to run on the date on which "the employee knew or should have known of the union's final action or the date on which the employee knew or should have known of the employer's final action, whichever occurs later." Proudfoot, 779 F.2d at 1559. "Final action" was defined as "the point where the grievance procedure was exhausted or otherwise broke down to the employee's disadvantage." Id. Proudfoot, therefore, confronted the problem of the conflict presented where a union member seeks to exhaust internal remedies, and adopted the first of the solutions proposed in Davis.[20]

secure relief through internal union remedies. The Court's disposition of DelCostello's claim therefore suggests that the dissent is incorrect in arguing that the point at which the statute of limitations begins to run necessarily coincides with the point at which the union member has a cause of action in this context.

**19.** Upon expiration of a collective bargaining agreement, the steelworkers union in Erkins went on strike. During the ensuing strike, union strike officers allegedly embezzled funds, self dealt, misadvised the union membership on their replacement rights, failed to negotiate a reasonable successor collective bargaining agreement, and unnecessarily prolonged the strike. The NLRB decertified the union. The plaintiff class consisted of former union members who admitted that they had discovered the alleged fraud and breach of duty almost 11 months prior to bringing suit. No grievance proceedings were involved.

**20.** The district court in Waring v. International Longshoremen's Association, Local 1414, 653 F.Supp. 374 (S.D.Ga.1986), quoted the language from Davis v. UAW, 765 F.2d 1510, 1515 n. 13 (11th Cir.1985), cert. denied, —— U.S. ——, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986), and concluded that requiring union members to file a lawsuit during the period in which they are pursuing internal union remedies in order to protect their right to sue is "less satisfactory" than a rule tolling the statute of limitations:

[T]aking into account the waste of judicial resources and plaintiffs' money that would result from forcing all union members to file

■ We conclude that the rule announced in *Proudfoot* controls in this case. As we indicated in section III A above, the application of the section 10(b) limitations period to duty of fair representation claims [21] and LMRDA bill of rights claims [22] was compelled by reasoning by analogy to the *DelCostello* decision involving "hybrid" section 301/fair representation claims. We find no sufficient reason for applying the substantive rule of limitations from the "hybrid" suit context without also accepting the rule for when that substantive limitations period begins to run.[23]

Irrespective of whether a union member may be *required* by the union or by the courts to pursue union grievance proceedings prior to seeking to vindicate LMRDA rights in court,[24] applying the *Proudfoot*

---

suit for § 411 violations before exhaustion of internal remedies (and in light of the fact that such a requirement would contravene the federal policy against nonjudicial resolution of labor disputes) the Court holds that so long as a union member is engaged in a good faith attempt to exhaust his internal remedies with respect to a § 411 claim, the six-month period of limitations is tolled.

*Id.* at 382 (citations omitted). The *Proudfoot* rule is in accord with this standard.

**21.** *Erkins v. United Steelworkers of America,* 723 F.2d 837 (11th Cir.), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984).

**22.** *Davis v. UAW,* 765 F.2d 1510 (11th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986).

**23.** We are not persuaded by the dissent's arguments as to why differences between "hybrid" claims and § 411 claims requires that a different statute of limitations rule apply. For example, the dissent fails to explain why a fair representation claim against the union alone, without a corresponding claim against the employer, should be governed by a different statute of limitations rule. The dissent concedes that the dual claims in a "hybrid" suit are "inextricably interdependent," and that "the alleged violation that serves as the key to the employee's lawsuit is the union's alleged wrong, not the underlying breach of the collective-bargaining agreement by the employer." In both situations, a union member might learn that his or her union has inadequately represented his or her interests; but the breach of duty may be mooted by subsequent proceedings. In both situations, the union member might be said to have a cause of action prior to the union's final action, but *Proudfoot* recognized that policy considerations favor tolling the statute of limitations until grievance proceedings are exhausted or otherwise break down to the employee's disadvantage.

**24.** 29 U.S.C. § 411(a)(4) limits the extent to which unions may require members to exhaust internal grievance procedures prior to seeking judicial relief. The provision, entitled "Protection of right to sue," states that:

No labor organization shall limit the right of any member thereof to institute an action in any court … *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof....

Section 411(a)(4) does not itself impose an obligation on a union member to exhaust his or her union remedies. *See Rizzuto v. Western Conference of Teamsters Pension Trust,* 573 F.2d 552, 554 (9th Cir.1977). Instead, it merely operates to limit any exhaustion requirement that a union chooses to include in its constitution: the provision permits a union to require that members resort to internal remedies, but only for a period of up to four months. *NLRB v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968). The *Industrial Union* Court construed the provision as permitting a district court, in its discretion, to stay a union member's action until union remedies have been exhausted or unsuccessfully sought, but only for a period of up to four months. 391 U.S. at 428, 88 S.Ct. at 1724. *See also Chapa v. Local 18,* 737 F.2d 929, 931 (11th Cir.1984); *Keene v. International Union of Operating Engineers,* 569 F.2d 1375, 1379 (5th Cir. 1978). In exercising its discretion to determine whether to grant a stay to permit up to four months of exhaustion of union remedies, the district court:

[M]ust determine "whether the available [union] procedures are adequate and reasonable in light of the facts of the particular case." *NLRB v. Marine Workers,* 391 U.S. 418, 428, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706 (1968). At least three factors are relevant in this inquiry: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks …; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

*Clayton v. International Union, UAW,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981).

*Davis v. UAW,* 765 F.2d 1510, 1512 n. 4 (11th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986).

rule in this context is consistent with federal labor policy. "Hybrid" section 301/fair representation claims place two major labor policies in conflict when internal grievance procedures are involved.[25] The traditional purpose of allowing exhaustion is to encourage private rather than judicial resolution of disputes. *Clayton v. International Union, UAW,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981). On the other hand, *DelCostello* refused to apply a limitations period longer than six months because doing so would preclude the relatively rapid final resolution of labor disputes favored by federal law. *DelCostello,* 462 U.S. at 168, 103 S.Ct. at 2292. *Proudfoot* resolved this tension by construing the section 10(b) limitations rule in a manner that permits a union member to exhaust available internal remedies without fore-

closing his or her right, in the event that this remedy proves ineffective, to seek relief in federal court. This construction has even greater applicability to appellant's action because "the national interests in stable labor-management bargaining relationships and the speedy, final resolution of disputes under a collective bargaining agreement are not implicated [in an action under 29 U.S.C. § 411]." *Davis,* 765 F.2d at 1514.[26] Accordingly, the policy favoring encouragement of private resolution of labor disputes supports our conclusion that we should not deviate from the *Proudfoot* rule in the context of a suit under section 411.

Application of the *Proudfoot* rule also avoids the waste of litigant and judicial resources endorsed by the dissent in this case.[27] As the Sixth Circuit explained in

---

In Hester's case, the IUOE does impose an exhaustion requirement on its members who seek redress for grievances with the union. IUOE's constitution contains a section entitled "All Court Actions Superseded," which provides that "[n]o suit ... shall be brought in any court ... by any member ... until and unless all rights, remedies and reasonable provisions for hearing, trial and appeal within the Organization shall have been properly followed and exhausted by the member ... complaining." This exhaustion provision is consistent with the time limitation imposed by § 411(a)(4) because the provision states that it "shall only require resort to internal remedies for a period not exceeding four (4) months." We need not decide if there were appropriate circumstances in this case that would have allowed the district court to "hear and decide" the case before the four-month period elapsed.

**25.** *See Frandsen v. Brotherhood of Ry., Airline & S.S. Clerks,* 782 F.2d 674, 678 (7th Cir.1986).

**26.** The Sixth Circuit's decision in *Dunleavy v. Steelworkers Local 1617,* 814 F.2d 1087 (6th Cir. 1987), supports our analysis. The *Dunleavy* court discussed two conflicting policies that bear on the issue of when the statute of limitations on an LMRDA claim begins to run:

On the one hand, there exists the important national policy favoring a swift and uniform resolution of labor disputes. This is the same policy that is at the heart of the imposition of the relatively brief six-month time limit borrowed from Section 10(b) of the NLRA. On the other hand is the policy embodied in the exhaustion doctrine which encourages the self-governance of labor organizations through the development of internal procedures, providing an avenue for redress of grievances for its members. This is the policy

that we think speaks the louder in the present case.

Through the policy of exhaustion, unions are afforded the initial opportunity to correct their own internal problems through self-regulation and are encouraged to be responsible for their own actions. Prior union action may assist the court in resolving the controversy that may eventually come before it by interpreting union rules and defining or redefining the issues. The need for self-governance is most clearly in focus where, as in the present case, the complaint alleges wrongdoing in internal union affairs.

*Id.* at 1089–90 (citations omitted). The court therefore agreed with Judge Edenfield's holding in *Waring v. International Longshoremen's Association Local 1414,* 653 F.Supp. 374 (S.D.Ga. 1986), that the statute of limitations is tolled during the period in which a union member engaged in a good faith attempts to exhaust internal union remedies.

**27.** The dissent's rule uses the statute of limitations to force union members to file fragmentary claims in order to protect their right to sue in the event that they should eventually desire to do so. Due to the fact that the dissent views the statute of limitations on Hester's cause of action against Local 660 as having begun to run on October 7, 1983, when Hester wrote to Local 660 denying the Local's charges and alleging that the Local violated the requirement that union members be given written specific charges, § 411(a)(5), prior to being fined or otherwise disciplined, Hester would have to have filed suit by April 7, 1984, in order to preserve his claims against Local 660. The dissent concedes, however, that Hester did not have a claim against either Local 320 or the IUOE until well after that date. Under the dis-

*Dunleavy v. Steelworkers Local 1617*, 814 F.2d 1087 (6th Cir.1987):

> The Union's position would seem to require one placed in [the union member's] situation to file a lawsuit which would become superfluous in the event of favorable Convention action simply as a matter of protection. In addition to other practical objections to such filings, we feel constrained to point out that we would be loath to require further cluttering up the docket of the overburdened federal judicial system for such a contingent purpose.

*Id.* at 1091. The *Proudfoot* rule avoids this waste of resources by allowing a union member to seek relief through union grievance procedures without foreclosing his or her right to sue in the event that these procedures prove ineffective.

■ Applying *Proudfoot* to the facts of this case, the timeliness of Hester's suit depends upon the date upon which Hester knew or should have known of the unions' final action. Final action is defined as the point where the grievance procedure was exhausted or otherwise broke down to the employee's disadvantage. *Proudfoot*, 779 F.2d at 1559. Here, there is no question that Hester learned of the unions' final action when the IUOE notified Hester that his appeal was denied on August 6, 1984. Hester filed suit three months later. We therefore conclude that none of his federal claims are barred by the statute of limitations.

We reverse the judgment of the district court and remand the case to the district court for further proceedings.

REVERSED and REMANDED.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court had subject matter jurisdiction over this case and concur in Parts I and II of the majority's opinion. I also agree with the majority that we are bound by *Davis v. United Auto., Aerospace & Agric. Implement Workers*, 765 F.2d 1510 (11th Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986), which applied the six-month limitations period found in section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b) (1982), to a suit brought by a union member against his union pursuant to section 102 of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 412 (1982),[1] alleging violations of LMRDA's bill of

---

sent's scheme, therefore, Hester had to file his claim in federal court against Local 660 prior to April 7, 1984, alleging a violation of the § 411(a)(5) right to specific written charges.

Hester's rights under § 411(a)(5) might also have been violated, however, if he were fined or otherwise disciplined without being afforded "a reasonable time to prepare his defense," § 411(a)(5)(B), or "a full and fair hearing," § 411(a)(5)(C). Hester could not, of course, have known whether these rights would be violated until the proceedings moved forward beyond his mere receipt of the charges. If any such violation occurred, the dissent would require Hester to attempt to amend his complaint or file a new action to allege violations of these rights. In the meantime, the district court would have to decide whether to stay the proceeding, see *supra* note 24, for up to four months to honor a contractual exhaustion requirement, or to go forward even though the union grievance proceedings might settle the entire controversy. A similar higgledy-piggledy situation would occur with respect to the duty of fair representation claims. Hester would then, under the dissent's scheme, have had to file another action or amend his complaint to join Local 320 as a defendant when Local 320 advised Hester on September 5, 1984 that it would not accept his membership dues until he paid the fine imposed by Local 660. Hester would have had to amend his complaint again or file another action against the IUOE when it denied his appeal on August 6, 1984. The *Proudfoot* court wisely rejected such an untenable statute of limitations rule.

1. 29 U.S.C. § 412 (1982) states the following:
 **§ 412. Civil action for infringement of rights; jurisdiction**
 Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located.

rights, 29 U.S.C. § 411 (1982).[2] As to the majority's analysis, in Part III. B., of when the six-month limitations period begins to run, I must respectfully dissent.

In this section 411 bill-of-rights suit brought by a union member against his union, the majority has mechanically applied the test of when a cause of action accrues—and therefore of when the limitations period begins to run—in a hybrid section 301[3]/fair representation suit brought by an employee against both his employer and his union. In a hybrid suit, the employee's causes of action against his employer and his union do not accrue until the dispute resolution process established by the collective bargaining agreement has been exhausted, or the union has decided to abandon the employee's grievance; only when one of these events occurs can the employee know whether he has been injured by his employer as a result of his union's failure fairly to represent him. In a bill-of-rights suit, as the Supreme Court and numerous courts of appeals have acknowledged, the union member has a cause of action against his union at the moment he learns that his union has infringed a right guaranteed him by LMRDA's bill of rights. *See, e.g., NLRB v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 426, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706 (1968); *Chadwick v. International Bhd. of Elec. Workers,* 674 F.2d 939, 941–42 (D.C.Cir.1982) (per curiam). By applying the hybrid suit test to a bill-of-rights suit, the majority not only ignores this precedent; it unfairly forbids the union member from bringing his suit until he has "exhausted" his internal union remedies (as provided by the union constitution), however long that may take. The majority's error becomes clear when one examines and compares the nature of a hybrid suit, and how and when its causes of action

accrue for statute of limitations purposes, with the nature of a bill-of-rights suit, and how and when its cause of action accrues.

### I.

### A.

The hybrid suit stems from an employee's grievance against his employer that the union has failed to resolve to the employee's satisfaction. In such a suit, the employee contends that he did not prevail against his employer because the union failed to prosecute his grievance in proper fashion through the dispute resolution mechanism provided in the collective-bargaining agreement.

The union has an affirmative duty to represent its members fairly. *See, e.g., International Bhd. of Electrical Workers v. Foust,* 442 U.S. 42, 46 n. 8, 99 S.Ct. 2121, 2125 n. 8, 60 L.Ed.2d 698 (1979) ("The duty of fair representation is ... implicit in the National Labor Relations Act."). In the context of a member's grievance with the employer, "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." *Vaca v. Sipes,* 386 U.S. 171, 191, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1967). In policing union conduct that is "arbitrary and perfunctory," courts have been willing

> to look beyond the question whether the union in fact pursues an employee's grievance (contractual or statutory) and to determine whether the union has made a full investigation, has given the grievant notice and an opportunity to participate, has mustered colorable arguments and has refuted insubstantial arguments by the employer.

R. Gorman, *Labor Law* 718 (1976).

Unions occasionally fail to fulfill this duty of fair representation. The Supreme

---

**2.** 29 U.S.C. § 411(a)(5) (1982), which is the portion of LMRDA's "bill of rights" pertinent to this appeal, states the following:

**(5) Safeguards against improper disciplinary action**

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof

unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

**3.** Section 301 of LMRDA governs "[s]uits by and against labor organizations" and is codified at 29 U.S.C. § 185 (1982).

Court has thus recognized that when an employee has a dispute with the employer, the federal labor policy of requiring exhaustion of any grievance or arbitration remedies provided in the collective-bargaining agreement "works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983). In those instances, when a union breaches its duty to represent fairly one of its members who alleges that the employer wronged him, the "employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.* (citations omitted).

Justice Stewart, concurring in the judgment, explained the practicalities of such a hybrid suit in *United Parcel Serv. v. Mitchell*, 451 U.S. 56, 66–69, 101 S.Ct. 1559, 1565–67, 67 L.Ed.2d 732 (1981).[4] A hybrid suit consists of two distinct claims, each with its own jurisdictional basis. The cause of action against the employer rests on section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982); the employee is alleging a breach of the collective-bargaining agreement. The cause of action against the union rests on the union's duty of fair representation, implied from the National Labor Relations Act, 29 U.S.C. §§ 151–170 (1982 & Supp. III 1985); the employee is alleging that the union breached its duty to process properly his grievance with the employer. *Mitchell*, 451 U.S. at 67, 101 S.Ct. at 1566 (Stewart, J., concurring in the judgment) (citation omitted); *see also DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290. In short, the hybrid section 301/fair representation suit, or "claim," amounts to "a direct challenge to 'the private settlement of disputes under [the collective-bargaining agreement].'" *Mitchell*, 451 U.S. at 66, 101 S.Ct. at 1566

(Stewart, J., concurring in the judgment) (citation omitted); *see also DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291.

Although a hybrid suit consists of two distinct claims, those claims are "inextricably interdependent." *Mitchell*, 451 U.S. at 66–67, 101 S.Ct. at 1566 (Stewart, J., concurring in the judgment); *see also DelCostello*, 462 U.S. at 164–65, 103 S.Ct. at 2291. A hybrid suit is an all or nothing proposition: either the union member prevails against both the employer and the union, or he loses against both. In other words, "[t]o prevail against either the company or the Union, [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976), *quoted in Mitchell*, 451 U.S. at 67, 101 S.Ct. at 1566 (Stewart, J., concurring in the judgment) *and DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291. As a practical matter, an allegedly aggrieved employee's success against his employer turns on whether he can first show that his union wronged him in processing his grievance.

Initially, the employee must show that the union did not fairly represent him; for example, the union may have processed the grievance in a poor or perfunctory fashion, or the union may have simply taken no action to assist the employee. If the employee can show that the union breached its duty of fair representation, he must then show that had the union properly processed his grievance, he would have prevailed against the employer, i.e., the employer somehow breached the collective-bargaining agreement in its treatment of the employee. If the employee cannot show that the union breached its duty of fair representation (either for lack of evidence or because the union acted properly), then the employee will not be heard to complain against the employer. *See Smith v. Babcock & Wilcox Co.*, 726 F.2d 1562, 1564

---

**4.** In *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the full Court adopted Justice Stewart's analysis of the hybrid suit and his view that the federal limitations period of section 10(b) applies to those suits.

(11th Cir.1984) (per curiam) ("The indispensable predicate for a § 301 action ... is a showing that the union has breached its statutory duty of fair representation.") (citation omitted). If, for example, the union acted properly in representing the employee, and the employee lost in all stages of the grievance or arbitration proceedings prescribed in the collective-bargaining agreement, a court will not relitigate the case against the employer, even if it appears that the employee should have prevailed against the employer.

In theory, an employee does not have to sue both the union and the employer. The employee may sue only one, "but the case he must prove is the same whether he sues one, the other, or both." *DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291. In short, the case the employee must prove reduces to this proposition: "a plaintiff[-employee] must prevail upon his unfair representation claim before he may even litigate the merits of his § 301 claim against the employer." *Mitchell*, 451 U.S. at 67, 101 S.Ct. at 1566 (Stewart, J., concurring in the judgment). Moreover, because "the duty of fair representation is 'part and parcel of [the] § 301 [claim],' " *id.* at 69, 101 S.Ct. at 1567 (citation omitted), "[w]hen the 6–month period of § 10(b) has passed, the employee should no longer be able to challenge the alleged breach of duty by his union, and as this is a precondition for maintaining the contract action, he should not be able to challenge the employer's action either," *id.* (footnote omitted).

The majority states that the *DelCostello* Court did not decide when the section 10(b)

---

**5.** The same statement was made by our court in *Proudfoot v. Seafarer's Int'l Union*, 779 F.2d 1558, 1559 (11th Cir.1986): "The Court in *DelCostello* did not decide when the six-month period begins to run."

**6.** This analysis of the hybrid suit avoids a dilemma that could otherwise frustrate an employee who has been wronged by both his employer and his union: an employee with a grievance against his employer may be prevented from repairing to federal court by the collective bargaining agreement, but when he is excused, possibly months later, from pursuing his contractual remedial rights because his union failed to represent him fairly, his hybrid suit may be barred by the statute of limitations.

---

six-month limitation period begins to run in a hybrid section 301/fair representation suit. *Ante* at 1544.[5] On the contrary, the Court's disposition of employee DelCostello's case indicates that the Court must have decided, even if implicitly, that the limitations period began to run when the regional joint union-management committee rendered its decision concerning the employee's grievance. *See DelCostello*, 462 U.S. at 155, 172, 103 S.Ct. at 2285–86, 2294–95. There was no doubt that DelCostello's suit was filed more than six months after the committee's decision, which under the collective-bargaining agreement was final and binding on all parties. *See id* at 172, 103 S.Ct. at 2294–95. The only reason the Supreme Court remanded the case for further proceedings was because DelCostello had raised a tolling issue that the district court had expressly declined to consider. *See id.* at 172, 103 S.Ct. at 2291.

In sum, *DelCostello* teaches that the hybrid suit should be viewed as two causes of action that accrue simultaneously and that the statute of limitations begins to run at the time of accrual. *See id.* at 163–65, 172, 103 S.Ct. at 2290–91, 2294–95; *see also Proudfoot v. Seafarer's Int'l Union*, 779 F.2d 1558, 1559 (11th Cir.1986).[6] More specifically, the limitations period on a hybrid suit normally begins to run when two events take place: (1) the dispute resolution process of the collective-bargaining agreement has been fully exhausted or the union has decided to abandon the aggrieved employee's cause at some point during that process,[7] and (2) the aggrieved employee

---

**7.** The facts in *DelCostello* presented the first of these two situations: the union prosecuted the employee's grievance to a conclusion, utilizing the entire dispute resolution process. The employee did not prevail, and when he received notice of this fact his cause of action accrued and the statute of limitations period began to run. Though the Supreme Court was not faced with the second situation posed in the text— whether the employee's cause of action accrues, and the limitations period begins to run, when the employee receives notice that the union has decided to abandon his grievance—I believe that the Court, given its analysis of the hybrid suit, would reach the conclusion I reach in the text.

receives notice of that fact. Our decision in *Proudfoot* recognizes that these two events signal the commencement of the limitations period. *Proudfoot*, 779 F.2d at 1559.

In examining the second event, we have said that section 10(b)'s six-month limitations period commences when the employee receives notice of facts that would lead a reasonable person to believe that his union has engaged in acts constituting a violation of his right to fair representation. *See Proudfoot*, 779 F.2d at 1559 (citing *Howard v. Lockheed-Georgia Co.*, 742 F.2d 612, 614 (11th Cir.1984)); *see also Davis v. United Auto., Aerospace & Agric. Implement Workers*, 765 F.2d 1510, 1515 n. 13 (11th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986); *Erkins v. United Steelworkers*, 723 F.2d 837, 839 (11th Cir.), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984). In other words, an aggrieved employee cannot be charged with notice that his union has breached its duty of fair representation until the union has considered his grievance and taken some action (or inaction) that would inform a reasonable person that the union has not or will not fulfill its duty fairly to prosecute the employee's grievance. When the union has elected to pursue the dispute resolution process of the collective-bargaining agreement, the employee cannot know whether his union's conduct has constituted a breach of the duty of fair representation until the process is completed and he has lost his case. If the employee believes that he would have prevailed had the union properly performed its duty, he has six months to bring his suit.[8] When the union decides not to prosecute the employee's grievance or, having begun the prosecution, decides to abandon it, the employee's cause of action begins to run at the moment the union notifies the employee of its decision.[9]

Having described the nature of a hybrid cause of action, and how and when it accrues for statute of limitations purposes, I now discuss the nature of a section 411 bill-of-rights suit, such as the one Hester has brought, instituted by a union member against his union, and how and when it accrues for statute of limitations purposes.

B.

In this case, Hester brought three separate causes of action, one each against the International Union of Operating Engineers (IUOE) and two of its locals, pursuant to 29 U.S.C. § 412 (1982). That section gives a union member the right to sue his union for violating rights secured by LMRDA's bill of rights, 29 U.S.C. § 411 (1982).

Local 660's conduct in disciplining Hester provided the basis for each of Hester's causes of action. Hester alleged that Local 660 fined him $3,000 for exercising his rights under the collective-bargaining agreement with his employer, but did so without serving him with a written charge, as required by LMRDA, 29 U.S.C. § 411(a)(5)(A) (1982),[10] specifying precisely how his employment in Local 660's jurisdic-

---

**8.** If the grievance procedure has made the employee whole, the employee could not possibly have a cause of action against his union (or his employer), even if the union failed to exercise due care in prosecuting his grievance.

**9.** In *Proudfoot,* this circuit measured the timeliness of a hybrid suit "from the date on which the employee knew or should have known of the union's final action or the date on which the employee knew or should have known of the employer's final action, whichever occurs later." *Proudfoot,* 779 F.2d at 1559. The court defined "final action" as "the point where the grievance procedure was exhausted or otherwise broke down to the employee's disadvantage." *Id.* The *Proudfoot* court's measurement of the timeliness of a hybrid suit strikes me as being a bit odd because the allegations of a hybrid suit are, first, that the employer wronged the employee in violation of the collective-bargaining agreement and, second, that the union wronged the employee because it did not represent him fairly in his grievance with the employer. The union's "final action" always occurs after the employer's "final action." Thus, it is not necessary to consider when the employer breached its contract with the employee. The limitations period should begin to run when the grievance procedure has been exhausted or otherwise has broken down to the employee's disadvantage. At that point, the employee should know whether his union handled his grievance fairly.

**10.** *See supra* note 2.

tion had violated union rules. Hester alleged that IUOE also violated section 411(a)(5)(A) when it approved Local 660's action by summarily denying his appeal.[11] Hester alleged that Local 320 thereafter violated section 411(a)(5)(A) when, on the basis of Local 660 and IUOE's unlawful disciplinary action, it refused to accept his union dues until he paid the fine imposed by Local 660, which IUOE had reduced from $3,000 to $500.[12]

As noted above, the three discrete LMRDA violations that Hester described in his complaint all arose out of the disciplinary action that Local 660 initiated against him. In a letter dated September 16, 1983, Local 660 charged Hester with violating IUOE's constitution by accepting employment in Local 660's jurisdiction without its consent, and with violating its trade rules. The letter also informed Hester that Local 660 had initiated disciplinary proceedings against him. In a letter dated October 7, 1983, Hester readily acknowledged that he had worked in Local 660's jurisdiction without its consent but denied that he had done anything wrong; he said that all he had done was to exercise his right to receive preference as a veteran, and that "[t]he union consented to veterans' preference when it signed the contract with TVA." In addition, he protested that Local 660's charge against him was not specific, as required by LMRDA's bill of rights, 29 U.S.C. § 411(a)(5)(A) (1982), in that it failed to state how he had violated Local 660's trade rules.

Obviously, by October 7, 1983, Hester had concluded that Local 660 was proceeding against him in violation of LMRDA's bill of rights. On that date, he had an absolute right to file suit in the district court against Local 660; he did not have to await the outcome of the union's disciplinary proceeding. *See Chadwick v. International Bd. of Elec. Workers*, 674 F.2d 939, 941–42 (D.C.Cir.1982) (per curiam) ("The district court's jurisdiction was absolutely unaffected by [the union member's] alleged failure to exhaust his internal remedies....") (discussing *NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968)); *see also infra* note 14 (concerning power of district court to stay suit for up to four months to enable union to complete its disciplinary proceeding).

Although Hester had an absolute right to sue Local 660 at any time during the six months following October 7, 1983, the majority would have denied him that right because Local 660's disciplinary proceeding against him had not been concluded. According to the majority, Hester had to participate in that proceeding, even if unlawful, and if disciplined, had to exhaust his appeal to IUOE. As it turned out, this disciplinary process was not concluded until August 6, 1984, when IUOE notified Hester that it had denied his appeal. At this point, the majority holds, Hester's causes of action against Local 660 and IUOE accrued and the statute of limitations began to run. The majority does not state when Hester's cause of action against Local 320 accrued; presumably, it accrued on September 5, 1984, when Local 320 suspended

**11.** In addition to bringing a bill-of-rights claim against IUOE, Hester alleged that IUOE breached its duty of fair representation when it affirmed a fine against him for exercising his right, under IUOE's collective bargaining agreement with TVA, to receive preference as a veteran. Clearly, Hester did not have a "fair representation" claim.

The duty of fair representation arises when the employee has a dispute with his employer and turns to his union for assistance and representation in pursuing the grievance procedures outlined in the collective-bargaining agreement. *See supra* text accompanying notes 4–5. Hester had no dispute with his employer and never sought union assistance to process a grievance under the collective bargaining agreement. Rather than a fair representation claim, Hester's claim against IUOE is that it ratified Local 660's illegal action by summarily denying his appeal.

**12.** These allegations make it clear that Hester's suit is not a hybrid one. He had no dispute with his employer, the Tennessee Valley Authority (TVA). In fact, TVA did exactly what Hester wanted it to do: it placed Hester's name on its veterans' preferential hiring list and, citing the collective bargaining agreement's provision giving preference in hiring to veterans over non-veterans, hired Hester to work at its Brown's Ferry site.

his membership pending payment of his fine to Local 660.[13]

### C.

As my discussion indicates, Hester had an absolute right to sue IUOE, Local 660, and Local 320 at the moment each of them violated LMRDA's bill of rights. The statute of limitations began to run as to each of these defendants on the day Hester received notice of its LMRDA violation. As of at least October 7, 1983—the day Hester wrote to Local 660—he was on notice that Local 660 had instituted disciplinary action in violation of his right, under section 411(a)(5)(A), to be "served with written specific charges." Hester did not bring suit against Local 660 in the district court, however, until November 7, 1984, well after the six-month statute of limitations had run. Hester's federal claim against Local 660 is therefore time-barred.[14]

As to Hester's cause of action against IUOE, the timeliness of his suit depends upon the date on which Hester received notice of its LMRDA violation, i.e., August 6, 1984 (or soon thereafter), when IUOE denied Hester's appeal. As to Hester's cause of action against his own Local 320,

---

**13.** On September 5, 1984—a month after IUOE denied his appeal—Hester's own Local 320 wrote him a letter explaining that IUOE's constitution would not permit it to accept his membership dues until he paid the $500 fine. The majority does not state, or even intimate, when Hester's cause of action against Local 320 accrued or when the statute of limitations on that action began to run.

**14.** Some may argue that the six-month statute of limitations period is tolled during the four-month period of 29 U.S.C. § 411(a)(4) (1982), which limits the extent to which unions and district courts may require members to exhaust internal grievance procedures before they litigate the merits of their claims:

No labor organization shall limit the right of any member thereof to institute an action in any court ... *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof....

The Supreme Court interpreted this provision in *NLRB v. Industrial Union of Marine & Shipbuilding Workers,* 391 U.S. 418, 426, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706 (1968), a case in which the Court ordered enforcement of an NLRB remedial order in favor of a union member who had been expelled from his union for having filed charges against his union before exhausting the internal remedies offered by the union's constitution. The Court wrote the following of section 411(a)(4):

We conclude that "may be required" is not a grant of authority to unions more firmly to police their members but a statement of policy that the public tribunals whose aid is invoked may in their discretion stay their hands for four months, while the aggrieved person seeks relief within the union.

*Id.* Section 411(a)(4) thus "does not establish a jurisdictional bar to judicial review that may be invoked by union defendants, but simply preserves the discretionary exhaustion doctrine that allowed courts to determine whether pur-

suit of internal remedies should be required in a given case even before the LMRDA was enacted." *Chadwick v. International Bhd. of Elec. Workers,* 674 F.2d 939, 942 (D.C.Cir.1982) (per curiam) (citations omitted); *see also Clayton v. International Union, United Auto., Aerospace & Agric. Implement Workers,* 451 U.S. 679, 689, 101 S.Ct. 2088, 2095, 68 L.Ed.2d 538 (1981) (listing factors district courts should consider when deciding whether to require exhaustion of internal union procedures); *ante* at 1546 n. 24.

Although Congress provided in section 411(a)(4) that unions and district courts may require resort to union remedies for a four-month period, it notably did not require complete exhaustion, when it could easily have done so. Thus, in my view, there is no legitimate basis, consistent with congressional intent, for using section 411(a)(4) to toll the limitations period during the four-month period.

Even assuming that as to Hester's federal claim against Local 660 the limitations period was tolled for four months, that claim would remain time-barred. Hester did not file his suit against Local 660 until seven months after the statute of limitations had already run. An additional four months during which to file suit could not have rendered Hester's suit against Local 660 timely.

Some might view this result—Hester's federal claim against Local 660 is time-barred—as harsh because Hester filed his suit before *Davis v. United Auto., Aerospace & Agric. Implement Workers,* 765 F.2d 1510 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1284, 89 L.Ed.2d 592 (1986), was handed down and within what Hester thought was the applicable statute of limitations. *See ante* at 1544 n. 17. Hester's trouble with Local 660, however, did not begin until several months after the Supreme Court decided *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), a case that not only foreshadowed *Davis,* but compelled it. In any event, I believe that we are bound to reach this result by the precedent of the Supreme Court and of this circuit.

the timeliness of his suit depends upon the date on which Hester received notice of its LMRDA violation, i.e., September 5, 1984 (or soon thereafter), when Local 320 wrote a letter to Hester explaining that IUOE's constitution would not permit it to accept his membership dues until he paid the fine. Hester brought suit in the district court against both IUOE and Local 320 on November 7, 1984, well before the six-month statute of limitations had run for Hester's causes of action against IUOE and Local 320. In sum, Hester's federal claims are time-barred as against Local 660, but not as against IUOE or Local 320.

Instead of adopting a rule whereby the limitations period starts running when the union member's cause of action accrues— i.e., on the day he receives notice of his union's LMRDA violation—the majority has said, contrary to Supreme Court precedent, that the limitations period starts running when the union member receives notice that the union's internal dispute resolution procedures (as found in the union constitution) have been exhausted. The majority derives this "exhaustion" rule from the inapposite observations in *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), and in *Proudfoot v. Seafarer's Int'l Union*, 779 F.2d 1558 (11th Cir.1986), that the cause of action in a hybrid section 301/fair representation suit cannot accrue until either the dispute resolution process of the collective-bargaining agreement has been fully exhausted or the union has decided to abandon the aggrieved employee's cause at some point during that process.[15] By doing so, the majority simply fails to recognize the difference between a hybrid suit and a section 411 bill-of-rights suit.

A hybrid suit is based on the union's failure properly to represent the employee in his grievance with his employer; thus exhaustion (or a breakdown) of the grievance procedure must occur before the hybrid suit's causes of action can accrue. In contrast, a section 411 bill-of-rights suit, which is based on a union's denial of a member's LMRDA rights, does not require exhaustion of internal union dispute resolution procedures. The majority's rule is thus not only barred by Supreme Court and lower court precedent, *see, e.g., NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 421–28, 88 S.Ct. 1717, 1720–24, 20 L.Ed.2d 706 (1968) (whether district court should stay union member's suit pending exhaustion of internal union remedies is within sound discretion of district court); *Chadwick v. International Bhd. of Elec. Workers*, 674 F.2d 939, 941–42 (D.C.Cir.1982) (per curiam) (district court's jurisdiction unaffected by union member's failure to exhaust internal union remedies), but it also relies on inapposite authority for support.

Furthermore, the majority's analytical approach is unsound. The majority acknowledges, *ante* at 1546 n. 24, that section 411(a)(4)[16] does not prevent a union member from filing suit against his union, although the district court may stay the action for a period of four months while union remedies are being exhausted, *NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 426, 88 S.Ct. 1717, 1723, 20 L.Ed.2d 706 (1968). Presumably, the majority would also acknowledge that "[i]n appropriate circumstances, it is now well established that a district court can properly hear and decide a case [brought by a union member against the union] before the [four-month period of section 411(a)(4)] elapses." *Semancik v. United Mine Workers Dist. #5*, 466 F.2d 144, 150 (3d Cir.1972) (citations omitted); *see also Industrial Union*, 391 U.S. at 428, 88 S.Ct. at 1724 (in spite of Section 411(a)(4), "a court or agency might consider whether a particular procedure was 'reasonable' and entertain the complaint even

---

**15.** The majority has taken the *Proudfoot* language discussing when a cause of action accrues in a hybrid suit, *Proudfoot*, 779 F.2d at 1559, and applied it in the dissimilar context of a bill-of-rights suit brought by a union member against his union: "Applying *Proudfoot* to the facts of this case, the timeliness of Hester's suit depends upon the date upon which Hester knew or should have known of the union's final action." *Ante* at 1548.

**16.** *See supra* note 14.

though those procedures had not been 'exhausted' "); *Chapa v. Local 18, Indus. Union of Marine & Shipbuilding Workers,* 737 F.2d 929, 931 (11th Cir.1984) ("[Section 411(a)(4)] provides that a union 'may' require its members to exhaust reasonable internal hearing procedures before seeking court intervention, however the decision to enforce such a requirement in a particular case is within the sound discretion of the district court.") (citations omitted). What disturbs me is that the majority does not explain how a union member whose union violates his section 411 bill of rights can file suit in district court—and in appropriate circumstances have his claims decided—before exhaustion of internal union remedies, when, according to the majority's analysis, the union member does not even *have* a cause of action until the union has taken "final action," i.e., when *all* internal union grievance procedures have been exhausted. Only when the union has taken final action, the majority suggests, does the union member have a cause of action; that is the point at which the majority has said the limitations period begins to run.

The majority has created a strange scheme: if the union member who has been wronged by his union does not file suit in district court before exhaustion of internal remedies, his cause of action does not accrue, and the limitations period does not begin to run, until exhaustion. On the other hand, under the majority's theory, if the union member who has been wronged by his union does file suit in district court before exhaustion of internal remedies, his cause of action has accrued, and, under appropriate circumstances, the district court can decide the case. I cannot imagine that Congress intended this non sequitur. Moreover, I do not see how the major-

ity's scheme is consistent with any policy underlying our federal labor laws.[17]

## II.

I agree that the district court had subject matter jurisdiction over this case for the reasons given in the majority's opinion. Nevertheless, I would affirm the district court as to its disposition of Hester's federal claim against Local 660 because that claim is time-barred. I would reverse the judgment of the district court as to Hester's federal claims against IUOE and Local 320 and remand the case to the district court to enable it to consider the merits of those claims. On remand, the district court should revisit the question whether Hester's pendent state law claim should be dismissed or disposed of on the merits. *See Pharo v. Smith,* 625 F.2d 1226, 1227 (5th Cir.1980) (per curiam) ("That a plaintiff's state law claims will be time-barred if dismissed is certainly a factor, if not a determinative factor, a district court should consider in deciding whether to maintain jurisdiction over pendent state claims once the federal claims have been resolved.") (citations omitted).

---

**17.** The majority states the following: "We find no sufficient reason for applying the substantive rule of limitations from the 'hybrid' suit context without also accepting the rule for when that substantive limitations period begins to run." In my view, this is also a non sequitur. Merely because federal labor policies favor the relatively short limitations period found in section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b) (1982), rather than the longer periods available under state statutes, does not necessarily dictate that the limitations period

begins at the same time in all actions brought by union members. The appropriate method by which to determine when the statute of limitations starts running is to pinpoint when the union member's cause of action accrues. This can only be done by appreciating the nature of the suit the employee wishes to bring. As my analysis suggests, Hester's suit simply cannot be reasonably analogized to a hybrid suit for purposes of determining when the limitations period begins to run.