**Lawrence MASSEY, Plaintiff,**

v.

**UNITED TRANSPORTATION UNION
and Central Of Georgia Railroad
Company, Defendant.**

**Civ. A. No. 493–272.**

United States District Court,
S.D. Georgia,
Savannah Division.

Oct. 3, 1994.

Randall Arthur Schmidt, Savannah, GA, for Lawrence Massey.

Edward S. Sell, III, Sell & Melton, Macon, GA, James Loughridge Pannell, Patricia Tanzer Paul, Oliver, Maner & Gray, Savannah, GA, Kevin C. Brodar, Associate General Counsel, Cleveland, OH, for United Transp. Union.

Carey P. DeDeyn, Melanie D. Wilson, Sutherland, Asbill & Brennan, Atlanta, GA, William Elbert Dillard, III, Miller, Simpson & Tatum, Savannah, GA, for Central of Georgia R. Co.

## ORDER

EDENFIELD, Chief Judge.

Plaintiff Lawrence Massey was discharged for drug use by his employer, Central of Georgia Railroad ("CGR"). Prior to final action of a Public Law Board affirming his dismissal, Massey attended drug rehabilitation programs and made use of grievance procedures agreed upon by the United Transportation Union ("UTU") and CGR. Massey filed this suit after the Board denied his appeal, claiming breach of duty of fair representation by UTU and violations of a collective bargaining agreement and the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq. (1990), by UTU and CGR (collectively "Defendants"). Massey here appeals an order of the magistrate judge denying Massey's motion to amend his complaint to include a claim under 45 U.S.C. § 153 (1990) against CGR. UTU and CGR both move the Court for summary judgment, and UTU further moves for dismissal under Fed.R.Civ. Proc. 12(b)(1) and 12(b)(6). For reasons discussed below, Massey's motion to amend is DENIED, UTU's motion to dismiss is consequently DENIED, and Defendants' motions for summary judgment are GRANTED.

## I. Massey's Motion to Amend the Complaint

This Court may reconsider the decision of a magistrate judge, but will reverse it only "where it has been shown that the magistrate's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A) (1990)..

■ By Order of July 22, 1994, Magistrate Judge G.R. Smith denied Massey's motion to amend his complaint to include a claim based on inadequacies in the procedures followed by a Public Law Board pursuant to 45 U.S.C. § 153(q) (1990). Magistrate Smith's reasoning was sound, and the Court only supplements it here. After reviewing the record and the parties' briefs, the Court is satisfied that the necessary facts underlying Massey's proposed amendment were available before the deadline the magistrate imposed for amending the pleadings, much less the deadline set for filing motions. As CGR notes in its memorandum in support of the magistrate's order, Massey's own filings show that he was indeed aware of relevant facts months before the date on which he sought to file an amendment. The Court need not condone Massey's undue delay, *National Service Industries, Inc. v. Vafla Corp.*, 694 F.2d 246, 249 (11th Cir.1982), *Kreuzfeld, A.G. v. Carnehammar*, 138 F.R.D. 594, 609 (S.D.Fla.1991), especially long after the close of discovery. *See, e.g., Bryson v. Waycross*, 888 F.2d 1562, 1567 (11th Cir.1989), *reh'g denied, en banc*, 894 F.2d 414 (1990).

■ Massey's new factual allegations do present a cause of action discrete from his prior claims: Where he previously made what the Supreme Court terms a "hybrid" claim of breach of duty of fair representation and breach of contract against the Defendants, the proposed amendment focuses on procedural faults in the Board's deliberations. As discussed further below, final decisions of an arbitration board regarding discharge are generally not reviewable in federal courts, but board procedures may be attacked on three prescribed grounds: (1) failure of the board to comply with requirements of the Railway Labor Act; (2) failure of the board's order to conform, or confine itself, to matters within the scope of the board's jurisdiction; or (3) fraud or corruption by a member of the board making the order. 45 U.S.C. § 153(q). *See Diamond v. Terminal Ry. Alabama State Docks*, 421 F.2d 228 (5th Cir.1970). The three circumstances permitting judicial review of arbitration awards are extremely narrowly construed by reviewing courts. *Henry v. Delta Air Lines*, 759 F.2d 870, 871 (11th Cir.1985). Having carefully reviewed Massey's allegations, it is clear that they are extremely unlikely to support a claim under § 153(q). *See* Pltf's Memorandum in Support of Notice of Appeal, at 3–5; *Union P.R. Co. v. Sheehan*, 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978), *reh'g denied*, 439 U.S. 1135, 99 S.Ct. 1060, 59 L.Ed.2d 98 (1979). The amendment would be a futile exercise; Massey's best hopes lie with his original hybrid claim.

The Court is aware that leave to amend should be "freely given when justice so requires." Fed.R.Civ.Pro. 15(a). Pleading is no longer a "game of skill in which one misstep by counsel may be decisive to the

outcome" of a case. *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Here, Massey's proposed amendment is not supported by factual allegations sufficient to make out a claim under the specific provisions of 45 U.S.C. § 153(q). Massey's counsel was familiar with our local rules, cognizant of relevant deadlines, granted an extension of time, and without a good reason for the delay. When these observations are viewed in light of the minimal prospects for victory on the new claim, the Court is content that affirmance of the magistrate's order will not unduly tilt the scales of justice.

## II. UTU'S Motion to Dismiss

■ UTU's motion to dismiss is predicated on the Court granting Massey's motion to amend. UTU argues that if the Court allows the amendment, the union is not a proper party to the new claim. Since the Court rejects Massey's amendment, UTU's motion is denied as moot.

## III. Motions for Summary Judgment

■ The court is left with Defendants' summary judgment motions. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." All evidence must be considered "in the light most favorable to the non-moving party," with all reasonable doubts resolved in favor of that party. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). If the evidence favoring the nonmoving party is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (subsequent history omitted). A mere "scintilla" of evidence will not suffice to support the nonmovant's position. *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990).

In their motions both Defendants argue that this Court lacks subject matter jurisdiction and that the record does not support Massey's claim of inadequate representation. CGR further argues that Massey's claims are barred by the applicable statute of limitations.

### A. The Statute of Limitations

■ CGR argues that Massey's hybrid claim is governed by a judicially created six months statute of limitations, and the claim was brought more than six months after the "final action" of the Public Law Board. CGR's first point is correct; its second is not. After *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 169–72, 103 S.Ct. 2281, 2293–94, 76 L.Ed.2d 476 (1983), *remanded & aff'd,* 762 F.2d 1219 (4th Cir.1985), hybrid claims are clearly governed by a six month limitation period borrowed from § 10(b) of the National Labor Relations Act. The limitation period begins to run when the employee knew or should have known of the union's or employer's final action in the grievance process, whichever occurs later. *Proudfoot v. Seafarer's Int'l Union,* 779 F.2d 1558, 1559 (11th Cir.1986), *later proceeding,* 1988 A.M.C. 1816 (11th Cir.1986). Final action is defined as the point where the grievance procedure is exhausted or otherwise breaks down to the employee's disadvantage. *Id.*

■ In the instant case, the Public Law Board convened on September 24, 1992, its decision was issued on April 30, 1993, and this action was filed on October 26, 1993. CGR maintains that the "final action" of the Board occurred on September 24, 1992, when it convened, and so this suit was filed long after the six month deadline. We hold, however, that the limitation period properly began to run on April 30, 1993, when Massey was notified that his appeal was denied. *See Hester v. Int'l Union of Operating Engineers,* 818 F.2d 1537, 1544–48 (11th Cir.1987), *reaff'd in relevant part after clarification and vacation,* 878 F.2d 1309 (1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1808, 108 L.Ed.2d 939 (1990); *Howard v. Lockheed Georgia Co.,* 742 F.2d 612, 614 (11th Cir. 1984). Before that time, he had not fully "exhausted" his arbitration remedies and could not have known his status with CGR or whether a lawsuit would be necessary to further pursue his claims. *See Hester,* 818 F.2d at 1544–48. Massey's notification of the

Board's award is the point at which he became aware that the grievance procedure had "broken down" to his disadvantage. Counting from that date, this lawsuit was filed just within the six month period. CGR's claim on this ground is denied.

### B. Subject Matter Jurisdiction

 When reviewing arbitration decisions made under the RLA, courts must first decide whether the dispute at issue is "minor" or "major." Minor disputes are those which concern the application or interpretation of an existing collective bargaining agreement; no party is attempting to change the actual agreement or create a new one. A major dispute concerns unilateral changes in rates of pay, working conditions, or other significant aspects of an existing agreement, where the mechanism for change is not provided for in the agreement itself. *See Hendley v. Central of G.R. Co.,* 609 F.2d 1146, 1150 (5th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed.2d 822 (1981); *Airline Pilots Assoc. v. Pan American World Airways,* 599 F.Supp. 108 (E.D.N.Y. 1984), *aff'd without op.,* 767 F.2d 908 (2d Cir.1985). Disputes involving the resolution of wrongful discharge claims are considered "minor." *Andrews v. Louisville & N.R. Co.,* 406 U.S. 320, 322–24, 92 S.Ct. 1562, 1564–65, 32 L.Ed.2d 95 (1972). *See also Hawaiian Airlines v. Norris,* — U.S. —, —, 114 S.Ct. 2239, 2246, 129 L.Ed.2d 203 (1994) (citing *Andrews* for that proposition).

 The RLA requires that railroads and their employees settle minor disputes through grievance procedures. 45 U.S.C. § 151–63. If those procedures fail, either party may appeal for compulsory arbitration to the National Railroad Adjustment Board or a substitute instituted by mutual agreement. *Id.* § 153(i), 153 Second. Board decisions and awards are final and binding on both parties, *id.* § 153(m), and Board jurisdiction is exclusive. Board decisions are the "complete and final means for settling minor

disputes." *Gunther v. San Diego & A.E.R. Co.,* 382 U.S. 257, 263–64, 86 S.Ct. 368, 371–72, 15 L.Ed.2d 308 (1965) (citation omitted). *See also Consolidated Rail Corp. v. Railway Labor Executives Assoc.,* 491 U.S. 299, 303–04, 109 S.Ct. 2477, 2480–81, 105 L.Ed.2d 250 (1989). Judicial review of these decisions is confined to the three procedural concerns listed in 45 U.S.C. § 153(q); the substantive decision of the Board is not directly reviewable. *See Sheehan,* 439 U.S. at 93, 99 S.Ct. at 402; *Union P.R. Co. v. Price,* 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959).

 Both Defendants claim that Massey is, "in essence," attempting to relitigate his termination by challenging the Public Law Board's final decision to deny Massey's appeal. Defendants consequently dispute subject matter jurisdiction under the above principles. It avails the Defendants nothing, however, to recharacterize Massey's claim and then shoot it down. If Massey were directly challenging the final decision of the Board then this Court would indeed lack subject matter jurisdiction. But he clearly is not, at least not according to Supreme Court precedent, which explicitly allows Massey's hybrid claim against unions and employers *despite* judicial deference to final Board decisions.

 The claim is a "hybrid" because, as a formal matter, it comprises two causes of action. Technically, the plaintiff first brings suit against the employer for dismissing the employee without "just cause." *Reed v. United Transp. Union,* 488 U.S. 319, 328, 109 S.Ct. 621, 627, 102 L.Ed.2d 665 (1988); *See Vaca v. Sipes,* 386 U.S. 171, 183, 87 S.Ct. 903, 913, 17 L.Ed.2d 842 (1967). *See* Pltf. Exh. 1, at section A.1 (agreement between UTU and CGR). This claim rests on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1990) ("LMRA"), governing suits by and against labor organizations.[1] *Reed,* 488 U.S. at 328, 109 S.Ct. at 627; *DelCostello,* 462 U.S. at 164, 103 S.Ct. at 2290. Next, the plaintiff must claim that the

---

1. "[Where the union breaches its duty] an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *DelCostello,* 462 U.S. at 164, 103 S.Ct. at

2290. The employee may, if he chooses, sue one defendant and not the other, but the case he must prove is the same whether he sues one, the other, or both. *See id.* at 165, 103 S.Ct. at 2291.

union breached its duty of fair representation by mishandling the ensuing grievance and arbitration proceedings: Unless the employee can establish that the integrity of the grievance or arbitration procedures was subverted by the union, a court will not displace the final decision reached by an arbitral body. *See United Parcel Service v. Mitchell,* 451 U.S. 56, 62, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732 (1981); discussion, supra. Consequently, even though the claim against the employer precedes the claim against the union, the Court must dispose of the latter claim first. The two claims are "inextricably interdependent," *Id.* at 66–67, 101 S.Ct. at 1565–66 (citation omitted); proving the union's breach of duty clears the way for proof of the employer's breach of contract.

■ Thus there is a potential hybrid claim wherever the union does not adequately represent an employee during grievance procedures. The Supreme Court has held that lack of judicial review in such cases would work "an unacceptable injustice," *Del-Costello v. Teamsters,* 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983), since the employee would be denied legal recourse despite not having received fair representation during arbitration of his case. Unions have a legal obligation to fairly represent employees in the course of grievance proceedings,[2] and if a union breaches that duty of fair representation, the bar to federal court review is rightfully lifted. *Hines v. Anchor Motor Freight,* 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976); *Harris v. Schwerman Trucking Co.,* 668 F.2d 1204, 1206 (1982).

Massey's claims of breach of the duty of fair representation and breach of the collective bargaining agreement comprise exactly this brand of hybrid suit. Defendant CGR argues that Massey, if making a hybrid claim, lacks sufficient evidence to support the fair representation component, and so this Court is not "authorized" to exercise jurisdiction. Reply of CGR to Pltf's Resp. to CGR's Mtn for Sum.Judg., at 3. The former, however, does not beget the latter. It is indisputable that despite the sanctity of Board decisions, hybrid claims are cognizable under the RLA; they mitigate the potential injustice created by inadequate representation. Thus, the Court has subject matter jurisdiction.

Defendants' jurisdictional claim is denied. The weight of evidence behind Massey's claim is, however, a proper inquiry for summary judgment; if Massey cannot demonstrate a breach of duty by the union, Defendants prevail. It is to that issue we now turn.

## C. Evidence Supporting a Hybrid Claim: Massey's Claim Against UTU

### 1. The Facts

The Court will first outline the facts in this case, and then review the caselaw on fair representation in the labor context. If the facts, considered in a light most favorable to Massey, cannot support a fair representation claim against UTU, summary judgment will be granted, since that claim is a necessary predicate to the claim against CGR. If the facts might support a successful claim against UTU, summary judgment will be de-

**2.** The duty of fair representation exists because it is the policy of federal labor statutes to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a minority union as their representative. The duty was developed over twenty years ago in a series of cases involving racial discrimination by unions certified as exclusive bargaining representatives under the RLA. *See Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). It was soon extended to unions certified under the National Labor Relations Act. *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

If individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca,* 386 U.S. at 177, 87 S.Ct. at 909. This standard articulated by Justice White in *Vaca* was recently solidified in *ALPA v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), as the "tripartite standard" governing all union activity. The duty of fair representation is the only "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Id.* 386 U.S. at 182, 87 S.Ct. at 912.

nied. No party has briefed the § 301 claim or made motions upon it.

The record in this case is thorough. There are no material issues of fact as to the union's representation of Massey at his investigative hearing, and only one issue of fact, discussed below, material to UTU's representation of Massey at his appeal to the Public Law Board. Unless otherwise noted, the Court draws its factual review from the stipulations contained in the Pretrial Order or from the submissions of fact by the parties, where those submissions are in agreement. The Court does not dwell on the details of Massey's drug use and rehabilitative efforts; those aspects of the case are relevant to the employer's decision to discharge Massey, not to his fair representation claim.

Lawrence Massey was hired by CGR in 1979, and during his employment was a member of the UTU. The rules, rates of pay, and working conditions applicable to his position were governed by the terms of the collective bargaining agreement between CGR and UTU. In September 1990, Massey was given a random drug test, pursuant to CGR policy, that returned positive for cocaine use. Massey was suspended from service and asked to contact Drug and Alcohol Abuse Rehabilitation Services ("DARS") or face permanent dismissal. He contacted DARS, and was introduced to Edward Ragan, a rehabilitation counselor, who told Massey that he could either initiate a grievance procedure against CGR, which would take nine months, or he could complete the DARS program and return to work in six months. Massey chose the latter route.

Massey participated in the program with varying degrees of success, attending meetings, conferring with Ragan, and taking further drug tests at regular intervals. Massey was a willing participant, but suffered at least one relapse, and ultimately did not complete the program. In March 1992, Ragan turned Massey's case over to his superiors for disciplinary action.

In early April, Massey was notified by Norfolk Southern Railway Company, CGR's parent company, that an investigation would be initiated to determine if he bore any responsibility for failing to comply with CGR's policy on drugs as embodied in the DARS program. Massey was represented in this process by Bruce Daniel, General Chairman of UTU, and Ricky Warren, Local Chairman. Both men met with Massey before the investigative hearing to discuss his case. In addition, Massey arranged for witnesses to appear on his behalf.

The investigative hearing took place on April 8, 1992. The Court has a full transcript of the proceedings, UTU Exh. 22, which conveniently eliminates any factual ambiguities about union representation at that stage. Daniel, Warren, and Massey attended the hearing, along with four supporting witnesses. Superintendent N.R. Gardner, who presided over the hearing, examined Edward Ragan on behalf of Norfolk Southern and elicited a chronological review of Massey's case and a summary of reports made by Ragan during Massey's time in the DARS program. Gardner also questioned the other witnesses presented. Both Daniel and Massey questioned Ragan, and examined and cross-examined witnesses, including the four witnesses testifying for Massey. Massey spoke on his own behalf. During the hearing, Massey admitted that he did not comply with DARS requirements (he substituted a self-created treatment regimen), *id.* at 15, and agreed at the conclusion of the hearing that it had been "conducted in a fair and impartial manner." *Id.* at 37; Pretrial Order, p. 4, at ¶ 26 (stipulations).

Superintendent Gardner found that, despite being given many opportunities to reform his behavior, Massey had "clearly" violated company policies; on April 15, Norfolk Southern issued a letter to Massey notifying him of his dismissal for failure to comply with company requirements for drug rehabilitation. Massey and his two representatives proceeded through various grievance channels, and his discharge was eventually set for a hearing before Public Law Board No. 4492, the final arbiter of grievances under the collective bargaining agreement between UTU and CGR. The hearing would be held in Norfolk, Virginia, on September 24, 1992, despite a collective bargaining provision designating Atlanta as the proper location. *See* Pltf Exh. 4.

The Public Law Board acts in an appellate capacity, reviewing the record generated during the prior investigative hearing. The RLA requires that it contain three members: one chosen by the employer, one by the union, and one neutral. 45 U.S.C. § 153 Second. Here, R. Frank Spivey, a former General Chairman of the UTU, was the union Board member. General Chairman Daniel spoke to Spivey before the Board hearing, but Spivey apparently told Massey that, despite talking with Daniel, he was not familiar with Massey's case. Massey Dep. at 78. Daniel also submitted a brief with attachments on Massey's behalf prior to the hearing, UTU Exh. 28; Massey did not see the brief prior to the convening of the Board, although he did confer with Daniel by phone. *Id.* at 73. Despite having told Massey that he would have representation at the hearing, Daniel did not attend, having been subpoenaed to testify in a trial in Atlanta. Local Chairman Warren was not present either.

Upon arrival in Norfolk, Massey discovered his sudden lack of live representation, but was also assured by Spivey that Daniel had described him as a "good worker and well-liked." There is no transcript of the Board hearing; apparently, however, it was brief: Massey made a short statement, was asked one question by the neutral, and the hearing was adjourned. *Id.* at 74. The Board members then began a private "executive session" to discuss the merits of Massey's appeal. The parties dispute the behavior of Spivey during this meeting. While Massey contends that Spivey did not argue for his reinstatement and in fact voted to uphold his dismissal, UTU and CGR argue that Spivey was a vigorous advocate on Massey's behalf, per 45 U.S.C. § 153 Second, and voted against Massey's dismissal.

Despite a contract provision requiring decisions to be rendered within thirty days, Pltf Exh. 4, the Board announced its award seven months later, on April 30, 1993. The Board found no violation of the collective bargaining agreement and upheld Massey's dismissal. It acknowledged the sincerity of Massey's arguments, but observed that "there is a limit at which forbearance ceases to be a virtue." Opinion of Board, UTU Exh. 30.

The instant suit was brought on October 26, 1993.

### 2. Analysis

The basis of Massey's fair representation claim is Spivey's participation in the Public Law Board hearing. Massey no longer claims any deficiencies at the investigative hearing stage; there is no mention of it in his response to the summary judgment motions, and no deficiency is evident from our record or the transcript of that proceeding. On the contrary, the transcript reveals that the union representatives were active advocates on Massey's behalf. *See, e.g.,* UTU Exh. 22, at 17–19 (examination of E. Ragan). With regard to the Public Law Board hearing, Massey asserts that (1) he should have had a union representative present to argue his case, (2) because there was no such representative, Spivey was acting in "conflicting roles," since he was both advocate for Massey and a Board member, (3) Spivey was too unfamiliar with the facts of Massey's case to render effective assistance, and (4) Spivey did not argue in Massey's favor during the executive session, and voted to uphold Massey's dismissal. There are, however, two difficulties with Massey's position. First, he does not produce any evidence to support these statements, while the union presents affidavits from Spivey stating that he understood Massey's case, "argued vociferously" on his behalf, and indeed voted for reinstatement. Although the Court will not weigh conflicting evidence, the party adverse to a summary judgment motion must submit more than "mere allegations or denials" when the movant is able to support its motion with affidavits and other evidence. *See* Fed.R.Civ.Proc. 56(e). The Court is aware that there is precious little direct evidence to be found in this context, and Spivey has significant ties to the Defendant Union. Second, however, even if the Court adopts all of Massey's allegations as true, he cannot prevail under current legal standards.

In order to establish a breach of the union's duty of fair representation, it must be shown that the handling of the grievance was "arbitrary, discriminatory, or in bad faith." *Airline Pilots Assoc. Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 1130,

113 L.Ed.2d 51 (1991) ("*ALPA*"). Such a showing might be made when the union ignores a meritorious grievance or processes it in "perfunctory fashion." *Vaca*, 386 U.S. at 190–91, 87 S.Ct. at 916–17; *Harris*, 668 F.2d at 1206. Courts will consider union behavior arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), as to be irrational." *ALPA*, 499 U.S. at 67, 111 S.Ct. at 1130. A distant relative of the established doctrine of judicial deference to legislative decisions, the irrationality standard is a potent one. *See id.* at 78–81, 111 S.Ct. at 1135–37. As for discrimination and bad faith, the former is inapplicable to the instant case because there is no individual or group against which to contrast UTU's treatment of Massey. As for the latter element, there are no allegations or evidence of intentional union misconduct.

■■■ To show that the union acted in a "perfunctory" fashion, merely shuttling an employee's claim through the grievance process with no concern for its resolution, Massey must demonstrate "that the union ignored the grievance, inexplicably failed to take some required step, or gave the grievance merely cursory attention." *Harris*, 668 F.2d at 1207 (footnote omitted). This Court expressed a similar standard almost twenty years ago: "to [represent the employee in the grievance process] merely to get through or rid of the matter; as a matter of routine and for form's sake only, without interest or zeal." *Mitchell v. Hercules Inc.*, 410 F.Supp. 560, 568 (S.D.Ga.1976). *See also Ethier v. United States Postal Service*, 590 F.2d 733, 736 (8th Cir.), *cert. denied*, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979) (to represent the claim "without concern or solicitude; indifferent").

In the instant case, viewing the facts in light most favorable to Massey, the union failed to provide live, oral representation to Massey at the Public Law Board hearing, causing Spivey to wear two hats—that of Board member and that of employee advocate. Further, Spivey executed these roles with little knowledge of Massey's case, and did not argue on the employee's behalf during the Board's deliberations.

None of this behavior meets the standards for arbitrary or perfunctory conduct. Especially in light of the fact that Daniel met with Massey, represented him throughout the grievance process, and filed a brief on his behalf with the Board, Daniel's absence—for good reason—from the Board hearing is not irrational or beyond the realm of reasonableness. Though live representation at Board hearings is customary, there is no statutory or contractual requirement. For example,

> (G) The Board shall hold hearings on each claim or grievance submitted to it. At such hearings, the parties may be heard *in person*, by counsel, *or* by other authorized representatives as they may elect. The parties may present, *either orally or in writing*, statements of fact, supporting evidence and data, and argument as to their position with regard to each case being considered by the Board.

Pltf Exh. 4, at 4 (agreement between UTU and CGR to establish a "special adjustment board" (here a Public Law Board) under 45 U.S.C. § 153 Second) (emphasis added). *See also* 45 U.S.C. § 153(j) ("Parties [before a Board] may be heard either in person, by counsel, or by other representatives."). Nor is Daniel's absence an indication of perfunctory union conduct; his attendance to Massey throughout the process and the full brief he submitted to the Board both represent far more than indifference.

As for Spivey's "dual" role, it in fact was nothing of the kind. As mentioned, the three-member Boards are composed of one member chosen by the employer, one chosen by the union, and one neutral; the members chosen by the parties are *intended* as advocates for their respective sides. The fact that the RLA describes the third member as a "neutral" implies this very point. 45 U.S.C. § 153 Second. The union and employer panel members are "associated in interest" with those respective parties, and are even compensated by them. *Id.* Spivey was never a "substitute" for Daniel at the Board hearing; he only fulfilled his statutory duty as that component of the three-member pan-

el most sympathetic to the grievant's position. *See, e.g., United Steelworkers v. Union Railroad Co.*, 648 F.2d 905, 913–14 (3d Cir. 1981). To that extent—and to that extent only—he acted both as both arbiter of the dispute and a supporter of Massey's cause. This behavior, without more, is neither unusual nor a breach of the union's duty of fair representation under current standards of arbitrary or perfunctory conduct.[3]

Finally, Spivey's lack of familiarity with Massey's case and failure to argue on his behalf do not signify a breach of UTU's duty to the employee. The available evidence implies that Spivey did actually vote in Massey's favor, but even if he did not, nothing in the collective bargaining agreement or the RLA *requires* union-appointed Board members to vote in favor of employees. Massey has produced no evidence of randomness in Spivey's actions or specific bias against Massey's claim. Further, Spivey's vote was irrelevant to the Board's final decision because both the neutral and the railroad's member voted to uphold Massey's dismissal. *See* 45 U.S.C. § 153 Second ("Any two members of the board shall be competent to render an award."). Though we cannot verify what Spivey said during the Board's executive session, the issue of whether or not he supported Massey's cause does not affect the legal conclusion.

As for not studying Massey's case beforehand, Spivey had spoken to Daniel before the hearing and received the Chairman's brief on Massey's behalf. Even if Spivey had been completely ignorant of Massey's plight, his conduct would at worst be negligent. "Negligence, however, is not enough to sustain a claim for breach of the duty of fair representation in any context." *Parker v. Connors Steel*, 855 F.2d 1510, 1521 (11th Cir.1988), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989). *See also United*

*Steelworkers v. Rawson*, 495 U.S. 362, 372, 110 S.Ct. 1904, 1911, 109 L.Ed.2d 362 (1990) ("The courts have generally assumed that mere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty . . . , and we endorse that view today.").

██ Unions are allowed considerable latitude in their representation of employees. The grievance and arbitration process is not conducted in a judicial forum and union advocates are not legally trained. Although labor grievance procedures may seem particularly loose to those reared in Article III courts, they are intended to be, and enjoy substantial judicial deference. *See Harris*, 668 F.2d at 1206. Even under Massey's most egregious scenario, no union conduct in this case constitutes a breach of its duty of fair representation. Because proof of this claim is a necessary predicate to reviewing Massey's discharge under § 301 if the LMRA, both claims fail.

## CONCLUSION

In sum, Plaintiff's motion to amend is **DENIED**. Defendant UTU's motion to dismiss is **DENIED AS MOOT**. The motions for summary judgment by Defendant UTU and Defendant CGR are hereby **GRANTED**, because even if this case is considered in a light most favorable of the Plaintiff, it cannot support a successful claim.

SO ORDERED.

---

3. Massey's reliance on *Thomas v. United Parcel Service*, 890 F.2d 909, 921 (7th Cir.1989) for the proposition that Spivey should not have been a pro-employee advocate while on the Board is misplaced. That case dealt with a "joint grievance committee," a stage of the grievance process where equal numbers of union and employer representatives comprise a panel to review the grievant's claims. This stage is technically a *pre*-arbitration stage; the purpose is to avoid arbitration, if possible, by discussing the claim in a structured forum. That scenario is not applicable here, in a case governed by the Railway Labor Act and involving genuine arbitration, that is, a panel containing a neutral individual intended resolve the dispute. No such neutral exists on joint grievance committees like those in *Thomas*, so impartiality is to be encouraged among the union and employer representatives. Without it, deadlock would be guaranteed.